Please call the meds, please. West 12-134, Edward Dzioban v. Workers' Insurance. Good morning, my name is Matt Belcher and I represent Ed Dzioban and I pray that this Court will be in order to hear the evidence.  First, the first is that the Court has not found that the employee was an employee due to the limited part of the evidence. And you want us to find that he was? Pardon me, Judge? And you want us to find that he was an employee? Yes, Judge. And there's two basic points that I'd like to emphasize for the oral argument because I believe the written materials are pretty thorough. Can you summarize? I mean, we know the elements, we know the tests. Yes, Judge. The first part is that I believe the Commission made a mistake when they failed to distinguish between the right to exercise direction and control and the burden of proof that shifts when there's evidence of actual control. So what WERA provides is that there's two actual tests here. First, we have the right to exercise direction and control. And then second, when actual evidence of direction and control is exhibited, the burden shifts to the employer to then show that that was in excess of the authority of the employer to exert that control. And so I know that you're going to interrupt me and say, I think, why don't you just run through some of the actual control that I think the record demonstrates. And so I will. The first is that Mr. Jobon is a maintenance man. He's not a painter. He's a maintenance man who went where he was told, when he was told, and did what he was told. The simplest examples of actual control are if Jobon is operating his own separate and distinct business, Mr. Hannon testified that joint management would allow Ed Jobon to hire his own helper. And then Jobon would pay that helper out of his $15 an hour. We didn't really figure out how would minimum wage be $8.25 an hour, how are you going to pay two people for $15 an hour. But regardless, Mr. Hannon testified that he retained or joint management retained control over whether or not this helper could be hired. So if Mr. Jobon is really operating his own separate and distinct business, how does joint management retain the right to decide who his helper is going to be? Next, how does joint management have the right to pull Mr. Jobon off of one job and move him to another job if, in fact, he's operating his own separate and distinct business? How does Dr. Masuda have the right to pull him off of a painting job and have him go tend her garden if he's operating a separate and distinct business? The clerks in the doctor's office have the ---- This is a very, as they say in some of the cases, a vexatious issue. Yes. Okay. If I have a contractor at my home, okay, an independent contractor, do I hire that person to perform work at my home, do I have any right to say, you know, I'm having a party tonight, just knock off if you want to go do that project on my garage? Yes, Judge. And then we look at the relative nature of your business versus the relative nature of this painter's business. You're not in the painting business, Justice Holdridge. And so, therefore, you're not ---- that's the relative nature of business tests. And that's the second part of the argument is that if you operate Justice Holdridge's painting company and you hire a man to come paint your walls, now, it's a separate analysis as to whether or not that person is an employee or not. But we always begin, as Justice Hoffman would remind me, with direction and control. And so I was just trying to lay out some of the actual control that was exerted. All right. So the control falls under what umbrella? Do they have the right to tell him where to go and when to go there? Is that sort of what you're saying? Yes, Judge. Okay. Also, the clerks at the doctor's office had the ability to call Joban and have him come and change a light bulb. Now, that's not what happened because Dr. Masuda told him to change this particular light bulb, that he was in the process of changing a joint management's light bulb on joint management's ladder at Dr. Masuda's medical office when he fell over and fractured his pelvis, tore his rotator cuff and fractured his elbow. Well, while we're on the subject of control, is there evidence to causing us to conclude that the employer controlled the manner in which the claimant performed his work? Well, and this is the... Did they inspect his work? Did they review his work? Did they control how he did the job? Or did they just tell him to do the job? Well, this is it, Judge, is that I think that a mistake is made when the commission says the evidence indicates that Hannon isn't a painter, as if the owner of the company needs to know how to paint. I submit to you that the owner of Turner Construction doesn't know how to arc weld. The test isn't, does Mr. Turner know how to arc weld? The test is whether they retain the direction and control to tell him to go and perform those tasks. And if they're unhappy with those tasks, then they have the power to terminate them. The same as in Mr. Jobin's case. Doesn't the case not talk about the employer's ability to control the manner in which the claimant performs the work? According to you, as long as they can tell him where to go and when to go, that's it. Not exactly, because once they exercise actual control over the employee or the alleged employee, the burden then shifts for them to show that the exertion of actual control was outside their authority. So we have two tests here. First we begin with the right to exercise direction and control. If I can demonstrate the right exists, then in theory the person is an employee. But once I demonstrate actual control, the burden shifts to the respondent, the employer, to demonstrate that that exertion of control was outside its authority. So the next step is that we have actual written instructions. Can I interrupt you there? Yes. It looks like you're going to continue on with the right to control factor. I want to back away from or back out from the analysis just a little bit to make sure I understand what your focus is on. Roberson sets forth several factors for the commission to consider in terms of whether or not it's an employee versus an independent contractor. And are you saying that the commission failed to consider any of these factors, or is it that they ascribe to the right to control factor or the way that they address that specific factor? Is that where your focus is on the right to control? The former. They applied the wrong test. They said that they failed to take into consideration that when actual control is demonstrated that the burden shifts to show that that exertion of control was outside the authority of the employer. And so it isn't just a question of manifest weight. It's a question also of which test you employ. And so I have written instructions, pages and pages of written instructions to Mr. Jobon of what to do to be at the Beverly building on Wednesday at 830, to be at the Hyde Park building on Monday at 8 o'clock, and then clean up the dental office, clean the screens, clean the vents, go clean the wall. All these written instructions. And then I have phone records from Mr. Jobon that indicate that Dr. Masuda or Dr. Masuda's office called him on a regular basis and it's set forth in a chart in the circuit court materials. But there's regular evidence of actual control being demonstrated that was never addressed by the commission at all. And the things that the commission set forth that I should have followed or should have shown is that the person had a W-2. I'm not sure how I was going to do that since he hadn't worked there for a year. Wear a company uniform. Establish that he could not turn down a job. But that's a mistake because it does, the record does demonstrate that if he turned down the job, as Mr. Hannon said, he would no longer be working for us. So I submit to you that no longer working for us is just a euphemism for saying if he turned down the job, he would be fired. You would agree it's, oh, I'm sorry. Go ahead. Well, you would agree that it's a very difficult line to identify this right to control factor. Justice Holdredge posited this hypothetical in regards to painting. You know, what if he observed that the painter was painting above a nice oriental rug and said, you know, please use a drop cloth there to protect my nice oriental rug. Now, has he exerted control to the point where he's an employer? You would agree that the commission has a very tough job applying that factor because there is no bright line. Correct. And may I suggest a bright line analysis, please? And I don't, you know, and I, as we were talking about this at my office earlier, I said I'd like to suggest to the judges this bright line analysis. But now you have this intrigue. Everybody tell me don't do it. We're not going to put car in drive, are we? No, no, no. There's no reverse, no drift. And no Orton Sinclair. There's none of that. So it's just a bright line analysis is that when we reach the inquiry as to the relative nature of the business, wouldn't it be much easier to amalgamate all the different points made in Ragler, Ware, Roberson into a more simplistic analysis of saying is there evidence that Ed Jobon was operating a separate and distinct business? And isn't really that the appropriate test of whether or not a person is an independent contractor once we get to this analysis that we were discussing a moment ago? For example, the operation of the Workers' Compensation Commission as far as status calls, trial dates, how to get a 19B heard, it's a very Byzantine system. And in order to figure out how to do it, you need to have a person in your office that handles the call. So I personally don't know how to do it. I rely upon Eva in my office to go and handle the call. That's all she does all day long. How come Eva isn't, how is she an employee and she's not an independent contractor? Because there's other companies that operate as a clerking service. And that's the answer is that if there's evidence that she's operating an independent or a distinct business, then isn't that really the analysis? That sounds well and good. But what if there's evidence that you're not operating an independent? Don't you end up in the same place under the traditional test? Here's the issue and the problem I'd like you to address. Yes, sir. My perception is, and I think it's a fair one, is the evidence here is conflicting, particularly on the right of the employer to control the employee. But there's a line of cases, and here's the hurdle you have to get over. I'm going to quote you something. It comes from the Area Transportation Company versus the Industrial Commission, 123 Illinois Appellate 3rd, 1096. Where elements of both the relationship of employer and independent contractor are present, commission alone, quote, unquote, is empowered to draw inferences either way. It goes on to say where reasonable inferences from the facts may be drawn either in favor of or against an employment relationship, the award of the commission must be upheld. So what they're saying is in most of these cases, and this case isn't unique, you're going to get conflicting evidence on these elements. I've yet to see a case where there isn't some evidence going both ways. So the courts are saying when you've got that, there's a great deal of deference given to the commission's decision. That's the hurdle you have in this case. Right. Because I think you've got a strong argument on some of your points. I've conceived that. And just, Justice Hudson, I look to your decision in Agnes Grubel's case. Agnes Grubel case, you overturned the commission. You said, no, you're wrong. That's not the proper analysis. Where? Where the opposite inclusion is clearly apparent. As in this case, I submit. Where? Overturning commission decision. Peasel? Overturning commission decision. In each instance, commission failed to interpret the facts in an appropriate way, failed to apply the appropriate tests, and then that's the same as we have in that Giovon case. And I submit to you that absent an introduction of a bright line type analysis, these cases are going to be coming in an avalanche. Because the real world post-recession employment relationships between people is changing. Where was not written for 2013. Robeson is not written for 2013. As counsel points out in her response briefs, now attorneys can be considered independent contractors. Well, what you're saying has been addressed by the only legislature in the Employee Classification Act. Are you familiar with that? Misclassification Act. And so don't they even state in that, you know, there is a problem in our state of employers classifying employees as independent contractors to get out of having to pay taxes, workers' compensation insurance, and so forth, and therefore we're passing this act. Yes, Judge. And may we take one step even further back and look at it from a larger perspective. Who paid Mr. Giovon's $50,000 hospital bill? Mr. Giovon couldn't pay it. Mr. Giovon had a fractured pelvis, torn rotator cuff, and a commutated fracture of his elbow. Where did that cost go? How was Mr. Giovon supposed to get insurance? You are creating a subclass of people that are essentially uninsurable. Is Mr. Giovon supposed to get workers' compensation insurance for Ed Giovon, maintenance man? And then if he even could obtain such an illusory policy, is he then supposed to file a claim, Ed Giovon versus Ed Giovon? How much is that going to cost for a man who makes $15 an hour? If we look at the overall picture of the purpose for the Workers' Compensation Act, are we really facilitating that purpose if we allow people to create these illusions of contractual relationships when actual control over these people is demonstrated? How significant is the lack of the exercise of supervision over the manner in which work is performed when work requires absolutely no skill whatsoever? It's immaterial, Judge. If you have a cleaning woman and you can tell her where to clean, do you really have to tell her to use a handy wipe? Or if you have a painter and you tell him to paint a room, do you really have to tell him to use a boar bristle brush? And start in the left corner and work your way down? If there's no skill required, isn't control over the manner in which work is performed rather irrelevant? Yes, Judge. And if a joint management company has two full-time maintenance men, they have some clerks, which I'm not sure of the relationship of them to the company, and they also have a secretary. The secretary is an independent contractor, too. They have no employee. And if his job is maintenance man, and the record reflects that Dr. Masuna has been known to change a light bulb himself, and the actual task being performed when the accident happened is changing a light bulb, is that skilled labor? And if it's not skilled labor, how is it that you require Dr. Masuna to guide Mr. Joban on changing this light bulb? Mr. Joban was on joint management's ladder with joint management's light bulb. They own 20, 30 ladders. But on their ladder, the ladder comes down, and he crushes the left side of his body. And then we look, and we find actual inferences of control, and the arbitration decision, which was confirmed in a summary manner by the commission, says that we should have shown that he was driving a company vehicle with a company decal on the side, or been on 24-hour standby, or was wearing a uniform. I mean, these are not the appropriate analyses when you're trying to decide whether or not direction and control, the right direction and control, existed. And then when the actual demonstration of direction and control is demonstrated, the burden never shifted. And then we have the relative nature of the business. That's what we know is perhaps the second most important factor. And then we ask ourselves, in an economic reality of this day and age, is Ed Joban operating a separate and distinct business? And he isn't. He's working exclusively, permanently, full-time basis for this company, doing what he's told, when he's told, where he's told. He cleans, he paints, he changes exit signs. He operates himself as solely within the business of joint management. Joint management business is the maintenance of their properties. They're not a real estate company. They don't buy and sell real estate. They're a maintenance company. Mr. Joban's, there's no business of joint management that Ed Joban isn't conducting. Except for administrative facts. Administrative details, hiring, firing, things like that. So your time is up. Yes, Judge. Thank you very much for your consideration. Counsel? Good morning, Justices, Counsel. Elizabeth Capoletti on behalf of the athlete. Ms. Capoletti, what did you do wrong to get stuck with us three days in a row? Well, I'm just so excited that today I'm not last. So let me actually get back to the office before noon. I would respectfully submit to you that the decision of the commission finding Mr. DeJoban, I don't pronounce it as well, as an independent contractor is supported by the manifest weight of the evidence and should be affirmed. And, Judge Hudson, the quote that I had actually highlighted was very similar to the one that you spoke about. It's where it says, when elements of both the relationship of an employee and an independent contractor are present and the facts permit an inference either way, the commission alone is empowered to draw the inference and its decision as to the weight of the evidence will not be disturbed on review. And as this Court has said numerous times, these are vexatious cases. They're difficult. And it's not because the factors that Robertson's outlines and threw well where are so complicated. I mean, that's not the difficulty is that they're so fact-specific. You have to look at every factor. And that's what the commission did in this case. There's absolutely conflicting evidence as to control. There's conflicting evidence as to the nature of the work. And the conflicting evidence as to control is Ms. Masuda testified specifically that she didn't have the authority to call him off from one job or another. Now, yeah, the claimant testified differently. But Masuda testified that, no, I didn't have that ability. He didn't work for anybody else. He only worked for a joint management company. According to him. But, again, Mr. Hannon testified. Okay. Let me rephrase. No evidence was introduced that he worked anyplace else. That's correct. Mr. Hannon testified that he had the ability to go and work at other places. And he, in fact, the claimant, in fact, testified that he owned his own apartment building and took care of that as well. And Masuda testified that their busy time really was from March to October. And after that, it was, you know, that that was really the time in which they had all of these apartments come due and that he would have lots to do. Masuda also testified that the claimant actually came to her and said, I need extra work. I need work. Please give me more work. I have a son who's sick in Poland. I need work. And she testified that's what she did. That, you know, she provided him with extra work on his request. She also testified relative to the control is that he came and went as he pleased. Now, there's certainly testimony from Masuda that there were three separate buildings and he was expected to be at those buildings at some time during those three days. When you say he came and went as he pleased, what about all these documents that your opposing counsel talked about of notes to him, be here at such and such time, do this, go there? Okay. There was a packet that was put into evidence. I think it consisted of about 20 pages. During the cross-examination, it was presented to Masuda and spoken about. She actually identified there were a couple of pages that, in fact, only related to the claimant. All the rest of it related to a different Janice, I think is the name, the other contractor. It really had nothing to do with it. Also, the one, I think, piece of information where they talked about timing, actually the timing in that was the tenant was leaving at 10 in the morning and the new tenant was coming in at another day at 9 in the morning. And it was just giving him time frames as to, look, this is when they're going to be out of there. You can go then. No, the testimony was very clear that he came to the office when he wanted to and he set his hourly schedule. And Masuda testified that it was up to him to make a determination how much time he would take in order to get it done. And they did say to him, yes, here's Department Number 5B. It needs to be done, you know, by the beginning of the month. But it was up to him to make the determination as to when he got it done, how he got it done, what supplies to utilize. And there's no question there is some elements of an employee. I mean, I'm not – I couldn't stand up here with a straight face and tell you not. I mean, he was paid hourly and there were some materials that were provided to him. But that's the point here is that there is conflicting evidence that the commission reviewed. And it was – You're resting on the law that says the commission's decision has given deference in cases such as this where there's conflicting evidence. That's correct. I mean, and there is sufficient evidence in this record to support the commission's decision that he was an independent contractor. And that is what specifically? Specifically relative to the control. Masuda and Hannan never controlled how he did this. Their testimony was he was hired as a painter slash handyman cleaner. And it was expected to him when these apartments became available, they would tell him he would go in, clean it up, and paint the apartment. They had no control over him. They didn't go during the day. Masuda specifically stated she did not have the authority to pull him off one job and put him on the other. I appreciate the claimant said otherwise, but she testified that. Hannan testified that he didn't supervise him throughout the day. He had no idea he would come by. And it was more of a quality control. Yes, he'd come by and say, hey, you know, hey, let me see where we are in the status. And I think it would be very similar. But he decided how to do the job, what materials to use, brushes. That was up to him. That's correct. And then he would turn in those receipts and we would reimburse him. And I even think the pay stubs, I mean, it's not that we have uniform pay stubs every week showing that he's working 40 hours a week. They vary week to week to week because his hours varied week to week to week because they were determined by how long it took him to actually perform the job. I mean, it was all driven by the job. And I actually take ‑‑ I disagree with the joint management company's job was part and parcel of what the claimant did. I mean, yes, they in fact managed properties. But managing properties isn't just about cleaning. And they even testified to the fact that they had numerous different independent contractors which did numerous different types of jobs to keep the properties going. I mean, I appreciate the managing properties. A portion of that is cleaning. But they weren't a cleaning service. That's not what they were doing. And I think in my brief I even give an example that there are lots of companies downtown that manage properties and they employ people to do the cleaning. That doesn't somehow shift them to become employees of those management companies. Yes, part and parcel of managing units and buildings is cleaning. But that's not the underlying purpose of the business. I mean, if I were a factory and I made widgets and I deemed every employee there as an independent contractor, you know, that's a much different argument. But this is just part of the management. So your argument would be that he's no different than like the plumber. If they had a plumbing problem, they had a plumber that they'd call and the plumber would come and fix the plumbing problem. That's correct. And they testified to that, that they had plumbers. They had tuck pointers. They had, I think, a carpeting service. And, yes, and his job mainly was to come in, clean the apartments, and paint them. That's what he was employed to do. And, yes, during March through October, it was a very busy time. And he did go. And, yes, they did direct him to which of those units he needed to go to. But that's where the control stopped. And I think to your point, even, I mean, there is a few written documents, but nothing that, you know, exercised this ongoing control. Same with the cell phone records. I mean, there are some cell phone records in there that show that there's, you know, some back and forth between the claimant and the respondent. But the claimant testified that he talked to him every day, multiple times a day. He was being directed all the time. That's not what those cell phone records show. So it's very possible that the commission inferred something else from those cell phone records. And that's what the commission's job is to do. It heard this conflicting testimony. It took in the conflicting documentary evidence and came to the decision that there was not enough control exerted. The other factors, such as the schedule, that they did not actually control his schedule, that he came and went as he pleased, that they did not withhold taxes, either income taxes or Social Security taxes. And the fact that the claimant was, in fact, a business owner. I mean, he knew, he testified that he had a dump truck business and he owned his own apartment building. But there was never any testimony that he objected to the fact that there was no withholding of his taxes, you know, during the time. He did testify that he anticipated receiving a W-2. But it was clear from the party's intent, certainly from Masuda and Hanna, that they thought he was an independent contractor. There was no, you know, application for employment ever filled out. I think he got to the services by some other independent third woman that brought him to this company. There was no W-4 filled out? No, no. There was none of that. Relative to the discharge, you know, and that's a fine line, too. I mean, when can you discharge somebody? Right, you know, I'm the treasurer at our condo association. We hire people to come in and do things. Well, certainly I'm going to discharge them if they act inappropriately or if they're not meeting the standards. But that doesn't mean, you know, all outright to complete control of discharging. Now, the claimant certainly testified that he felt that he would be discharged, you know, if he didn't comply with exactly all of their wills and wants. But that's not what Masuda or Hanna testified to. Hanna testified to the fact that, no, they wouldn't fire him during the middle of a job. If the job didn't meet their appropriate standards, they wouldn't offer him any more jobs. But that wasn't the nature of their relationships. I have a hard time with that factor anyway. Because the way sometimes people are trying to find employer relationships, it means that you're in danger if you have a contractor and you say, you're doing shoddy work, goodbye, out of here. Now have I made them my employee? Well, actually, yes, as I was going through this, I was a little concerned because we do actually employ a handyman from my condo association, which part of our association is to keep our, you know, keep our buildings nice and whatnot. We pay him hourly. You know, but he also turns in his times and services. And can I fire him? Is he now my employee? You know, even though that we've structured the relationship as an independent contractor. And that's what they structured the relationship here. Two, I do believe that parties should still be free to contract as to how they want to set up the relationship. I do appreciate the fact that. No, I think that part of the problem we have is that instead of either a person is an independent contractor with their own business or not, it gets structured whether they're an independent contractor. And that's why the Employee Classification Act was passed and so forth. I mean, that's the problem we run into. I mean, there's no doubt, is there, that, I mean, there are a lot of people out there calling people independent contractors when really they're employees. Sure. I understand that. And I guess that's the way this ends up being one of the most vexatious and difficult questions then as to, you know, what really is the standard. And, you know, I appreciate counsel's argument for a bright line test. But, I mean, I think the factors get us to where they need to be. And that's what Robertson is talking about. I mean, there's a lot of incentives for somebody to structure somebody as an independent contractor instead of an employee. Absolutely. There's no question. But there's also, you know, there's also a reason that they are set up that way because other people as an independent contractor go out and can offer their services to different places and whatnot. It doesn't necessarily make, you know, not everyone wants to be an employee. Well, there's incentives to be an independent contractor. Absolutely. Absolutely. Because you can, in fact, you know, direct your own self. You know, you're your own boss at that point as opposed to someone's employee. So with that, I appreciate it. And I would request that the decision of the commission be affirmed. Thank you, Justice. Thank you, counsel. Counsel in reply? Yes. Okay. And thus we return to the bright line test. Is the HVAC contractor operating a separate and distinct business? They have an office. They advertise. They have other clients. They have other customers. Is Ms. opposing counsel's handyman, is he operating a separate and distinct business? Does the tuck pointer operate a separate and distinct business? If the tuck pointer is operating a separate and distinct business, they have an office. They have their own staff. They have other customers. Well, there you go. It's an independent contractor. I also would like to point out that Dr. Masuda testified that these independent contractors, such as the snow removal contractor, they bid on the job. They're not paid hourly. They bid on the job. They complete the job, and that's it. As relates to the W-4, nor was there a W-9 filled out, which is required, any time you pay an independent contractor more than $600. In order for me to get a check from an insurance company, I need to provide them with a W-9 if it's more than $600. No evidence that W-9 was filled out. All right. As relates to Mr. Hannon testifying that he did not retain the right to terminate, I direct the court's attention to R-247, wherein it says, if Joban didn't follow your directions as to what to do, would Joban still have a job? What would Joban do if he turned down your jobs? Answer, I presume he'd find another job or stay home. So then he wouldn't be working for a joint management company. Answer, he wouldn't be working for us if he rejected the job. So that's a Hobson's choice. Either if he rejects the job, he gets fired. They're not going to hire him anymore. And so does that make him an independent contractor? Well, if we take a step back and say, well, is he operating a separate and distinct business? And if the answer is yes, your painter is operating a separate and distinct business, then clearly your termination or your cancellation of his contract did not result in an employment. So where do you end up if the evidence is conflicting on whether or not the person is operating a separate and distinct business? Don't you end up in the same place? Yes. Because the evidence both ways on that test. Yes, Justice Hudson. And so let's actually look at what the conflicting evidence is. The conflicting evidence, in my little notes here, the evidence of an independent contractor relationship. They didn't take taxes out of his paycheck. That's it. That's the evidence of an independent contractor relationship. Evidence of an employment relationship, actual direction and control that was never addressed, that was never offset by affirmative evidence. Relative nature of the work. Right to terminate. Paid hourly. Use of materials and equipment, and the latter, at the time of the accident. Janusz, the co-worker, who was of the same class as Mr. Joban, had a joint management Home Depot credit card. That's the evidence of employment. I submit to you and Agnes Scrubel, they didn't take taxes out of that paycheck either. And in fact, they had a written independent contractor agreement. In this instance, Mr. Joban didn't know he was even alleged to be an independent contractor. The form he filled out to get his paycheck says, employee. And he wrote his name. And it says, pay period. And he wrote in his hours. And then some secretary at some office, who's not an employee either, transcribed that into a typewritten invoice, they called it. And then they paid that invoice. I submit to you that there is essentially no evidence of an independent contractor agreement but for what's already been considered by this Court and dismissed as not being a sufficient factor to overrule all the other elements. And that's that he didn't take taxes out of his paycheck. That's it. Thank you. Thank you very much. Thank you, counsel. Mr. Mayor, if we take an advisory, this position shall issue.